IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BENJAMIN VAN ROY, SRINIVAS BOLLIMPALLI, EGGERT DAGBJARTSSON, AMIT DESAI, MARTIN FRIEND, JOHN HAIGH, ARNOLD LINDSETH, DINKAR MALLADI, LUIS MARTINS, CIAMAC MOALLEMI, PATRICK NGUYEN, VICTOR PACI, JAYENDU PATEL, JOSEPH SCHMID, ADEEB SHANA'A, BRETT SMITH, JOHN TSITSIKLIS, DANIEL VAN ROY, EDWARD VAN ROY, MARK VERSHEL, RICHARD ZECKHAUSER, HARISH LECAMWASAN as Trustee of the Lecamwasan Family Trust, and ROEBUCK ASSOCIATES L.P., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | C.A. No. |
| Plaintiffs, | ) ) | **JURY TRIAL DEMANDED** |
| | ) ) | |
| v. | ) ) | |
| | ) | |
| SAKHR SOFTWARE CO. (K.S.C.C.), FAHAD ABDULLAH MOHAMMED ABDUL RAHMAN AL SHAREKH, EXCUSE ME SERVICES, INC., SAKHR STOCK, LLC, and STEVEN L. SKANCKE, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

### PRELIMINARY STATEMENT

1.     This is an action for damages arising out of a Kuwaiti corporate acquirer's refusal to pay the agreed merger consideration after acquiring a US software company. On October 2, 2009, Sakhr Software Co., (K.S.C.C.) ("Sakhr"), a Kuwait shareholding closed company purchased 100% of Excuse Me Services, Inc., a Delaware corporation, ("EMS" or "Dial") in an all-stock merger valued by the parties at $14,000,000 (US). All of EMS's shareholders—most of

whom are plaintiffs in this lawsuit—delivered their EMS shares to Sakhr, which were then cancelled in exchange for a right to receive Sakhr shares valued at $14,000,000 ("the Merger Consideration"). Sakhr later refused to deliver the Merger Consideration.

2.      Sakhr's proffered excuse was that it could not obtain necessary consents from the Kuwaiti government. But in the Plan of Merger signed by all parties, Sakhr, Sakhr Stock, LLC, a US company set up by Sakhr to distribute the Merger Consideration ("Sakhr Stock"), and EXMS Holdings Corp., a US company set up by Sakhr to merge with EMS ("EXMS"), all expressly represented and warranted to EMS's shareholders that no Kuwaiti governmental approvals were required to consummate the merger, and an opinion of Sakhr's attorney delivered at closing represented that performance did not require the consent, license, approval or authorization of the Kuwaiti government. These and other pre-closing misrepresentations and omissions, given in greater detail below, defrauded the plaintiffs.

3.      In addition to their claims for securities fraud under federal law and common law fraud, the plaintiffs assert a claim for fraud in the sale of securities under the Delaware Securities Act. The plaintiffs assert a claim for breach of contract against Sakhr because Sakhr contractually promised to indemnify the shareholders against loss arising out of breaches of the representations and warranties, and it has failed to discharge its indemnification obligations. Lastly, the plaintiffs assert a breach of contract claim for Sakhr's failure to deliver the Merger Consideration.

## PARTIES

4.      Each of the plaintiffs is a former shareholder of EMS. As further alleged below, Benjamin Van Roy, one of the plaintiffs, is the Stockholders' Representative under the terms of the merger agreement at issue in this case. Van Roy is suing both individually in his capacity as a former shareholder and in his representative capacity as Stockholders' Representative.

5.     The defendant, Sakhr, is a Kuwaiti shareholding closed company.  On information and belief, its head office is located at  Kuwait—Sharq—Jabar Almubarak Street, Alshorooq Tower, Floor 21, P.O. Box 8196, Salmiya 22052, Kuwait.

6.     The defendant, EMS, is a Delaware corporation.  Its registered agent for service of process is Corporation Service Co., 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

7.     The defendant, Sakhr Stock, is a Delaware limited liability company.  Its registered agent for service of process is Corporation Service Co., 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

8.     The defendant, Fahad Abdullah Mohammed Abdul Rahman Al Sharekh ("Al Sharekh"), is the son of Sakhr's founder and was at all relevant times in control of Sakhr's business.  On information and belief, he has a place of business at Sakhr's offices in Kuwait.

9.     The defendant, Steven L. Skancke ("Skancke"), is the president and CEO of Sakhr Software USA, Inc., a subsidiary of Sakhr. He has a business address at 8065 Leesburg Pike, Suite 305, Vienna, Virginia 22182.

## JURISDICTION

10.     This action arises under a federal statute, §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5.

11.     The claims arising under state law asserted in this Complaint are so related to claims in the action within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

## STATEMENT OF THE CLAIM

A.    **Background**

12.    Prior to the merger at issue in this case, EMS was a US technology company.  It specialized in mobile applications and cloud-based speech recognition technology, and it offered a number of products, including "Dial Directions", "Say Who", and "Say Where".  Dial Directions was a voice-activated service for getting directions to addresses, businesses, and landmarks.  A user could dial a phone number, speak a street address or the name of a business or event, and receive an SMS message with directions to the destination.  Say Where was a voice-activated mobile application for obtaining location-based services, such as driving directions and local business information.  Say Who was a voice-activated mobile application for dialing contacts within a user's contact manager application.  A user could speak the name of a person, and the software would search the user's contacts and place the call to the desired phone number.

13.    Sakhr is a Kuwaiti software company that specialized in Arabic language technology, including technology for on-the-fly translation from Arabic to English and vice versa.

14.    In early 2009, EMS began partnering with Sakhr Software USA, Inc., a Sakhr subsidiary, to create a smart phone software application to allow real-time English-to-Arabic and Arabic-to-English translation.  A user could speak into his or her phone in one of the two languages, and then hear and read a translation of the spoken phrase into the other language.

15.    In March 2009, Sakhr made an offer to acquire EMS for $14,000,000 (US) pursuant to a written Letter of Intent ("the LOI").  The LOI was subject to due diligence and agreement on the form of definitive purchase documents.  The LOI called for Sakhr to purchase all of EMS's shares and pay for them with Sakhr shares.  The LOI contained representations and

warranties concerning Sakhr's profitability and financial stability, including a representation that Sakhr held over $10,000,000 in cash reserves. The LOI stated that in the event that the parties entered into a definitive agreement, all LOI representations and warranties would be deemed merged into the definitive agreement.

16.     Plaintiffs relied on Sakhr's representations of profitability and financial strength in agreeing to enter into the LOI, and later to execute the Merger Agreement.

**B.     Pre-Merger Discussions.**

17.     At an early stage in the merger discussions, the parties discussed various proposed merger structures, including whether Kuwaiti governmental authorities would require any form of pre-merger substantive review.

18.     In an e-mail dated May 7, 2009, Abdul Aziz Al-Yaqout ("Yaqout"), a lawyer with DLA Piper, wrote to Richard K.A. Becker ("Becker"), a lawyer with Hogan & Hartson.

19.     Upon information and belief, Yaqout and Becker were retained by Sakhr to structure the proposed merger, and to prepare the necessary merger papers, including any necessary filings with the Kuwaiti government.

20.     In his e-mail to Becker, which Sakhr later voluntarily shared with EMS, Yaqout confirmed that the proposed merger could be accomplished either by issuing new Sakhr shares to EMS shareholders or by transferring existing Sakhr shares. Yaqout noted that issuance of new Sakhr shares would require "… an independent valuer appointed by the [Kuwaiti] Court of First Instance at the request of the company." When asked: "If we decide to go a different route, and redistribute existing Sakhr shares instead of issuing new ones, will this remove the need for the lengthy process?", Al-Yaqout responded: "*Yes. There would be no lengthy process involved in such a scenario.*"

21.     Sakhr forwarded the May 7th attorney e-mail exchange to Adeeb Shana'a, EMS's

CEO and a selling shareholder, on May 7, 2009 with the approval of Sakhr's Chairman.  As a

result, EMS shareholders thereafter understood that a Kuwaiti share valuation would be

necessary if and only if Sakhr issued new shares in connection with the merger.

22.     For this reason, the parties then agreed that no new Sakhr shares would be issued.

Instead, Sakhr's existing shareholders agreed to use a portion of their existing shares to pay the

Merger Consideration, thus obviating the need for Kuwaiti government review and approval.

23.     Sakhr's agreement to use existing Sakhr shares for the merger consideration was a

material inducement to EMS shareholders to execute the Merger Agreement.

**C.     The Information Statement.**

24.     In connection with the proposed merger, and because the issuance of Sakhr shares

to EMS shareholders was deemed a sale of restricted securities within the meaning of Rule 144

under the Securities Act of 1933 and related state blue sky securities laws, the parties jointly

prepared and EMS distributed an Information Statement, Consent Solicitation and Notice of

Statutory Appraisal Rights (the Information Statement") to each EMS shareholder.

25.     The Information Statement clearly stated that,

> Information contained in this Information Statement regarding EMS has been provided
> by EMS ***and information contained in this Information Statement regarding [Sakhr] has***
> ***been provided by [Sakhr].***

(Emphasis added).  Sakhr knew that EMS relied on it to provide complete and accurate

information regarding Sakhr for inclusion in the Information Statement.

26.     Sakhr's counsel was provided with drafts of the Information Statement for review

and approval on multiple occasions during June 2009 before the Information Statement was

delivered to EMS's shareholders.

27.     The Information Statement confirmed that the same number of issued and

outstanding Sakhr shares pre-merger would be issued and outstanding post-merger, as follows:

> Parent [i.e., Sakhr] has **30,000,000 authorized shares** of capital stock, all of which are
> issued and outstanding.  The nominal value of each share is 100 fils or .10 Kuwaiti
> Dinars.
>
> * * *
>
> Sakhr is a private Kuwaiti shareholding close corporation and there is no public market
> for its securities.  For the purposes of the Merger, the parties have agreed that the post-
> Merger value of the total equity of Sakhr shall equal $224,000,000US ($210,000,000 pre-
> Merger valuation for Sakhr equity plus the $14,000,000 valuation of EMS).  Based on the
> current capitalization of Sakhr share has a pre-Merger value of $7.00US ($210,000,000
> divided by the 30,000,000 shares outstanding).  ***Post-Merger, the imputed value of a
> Sakhr share is $7.47US ($224,000,000 divided by 30,000,000 shares)*** …

(Emphasis supplied).

28.     The Information Statement additionally confirmed that the Merger Consideration

would come from *existing* Sakhr shares.

> Sakhr Stock LLC ("Distribution Sub") was formed on May 21, 2009…
>
> Sakhr formed the Distribution Sub because under Kuwaiti law, the direct payment of
> Sakhr shares as Merger Consideration from [Sakhr] to EMS Stockholders requires
> compliance with procedures which would greatly extend the amount of time required to
> complete the Merger. In order to effect the delivery of the Merger Consideration, upon
> Closing, ***existing Sakhr shareholders shall transfer the appropriate number of shares*** to
> Distribution Sub and Distribution Sub will be the delivery agent to the EMS Stockholders
> of the Merger Consideration…

(Emphasis added).

29.     The Information Statement further represented that "promptly following receipt of

your stock [EMS] stock certificates…[Sakhr] will pay and deliver to you the stock consideration

you are entitled to receive as a result of the Merger." Finally, under the caption, "Covenants

Related to Parent", the Information Statement represented that "[Sakhr] shall cause Distribution

Sub to be capitalized with a sufficient number of [Sakhr] shares to effect the Merger and

distribution of Merger Consideration."

30.     The representations made by Sakhr in the Information Statement were false because the defendants subsequently claimed after Closing that Sakhr was unable to transfer the Merger Consideration without first obtaining the approval of Kuwaiti governmental authorities.

31.     For example, in an e-mail dated December 22, 2009, Hassan Hanano, a consultant to Sakhr, wrote to Shana'a, stating:

> I am writing to follow up on the outstanding items needed by the Auditors in Kuwait to record the DD/Sakhr merger.
>
> If you remember, the outstanding item remaining is a document/letter from you, the CEO of DD at the time of the merger, explaining/justifying the [$14,000,000 merger] valuation.

On December 31, 2009, Hanano again wrote to Shana'a:

> *As you are aware, Sakhr is a company domiciled in Kuwait. EMS is domiciled in the US. In order for the merger to be completed in a clean manner, it must comply with all the rules and regulations of both jurisdictions. What we are trying to avoid here is a future claim by any financial authority in Kuwait that questions the validity of the shares held by ex-EMS shareholders, yourself included.*
>
> *This is the reason why we (Fahad [Al Sharekh], Steve [Skancke] and myself have been asking for the letter of Offer for the last few months. ...*
>
> *The letter of Offer would have had a clear indication of EMS' value, which would have been the ideal requirement for Kuwaiti compliance.*

(Emphasis supplied).

32.     Similarly, on April 8, 2010, Skancke wrote to Van Roy in response to his repeated requests to understand why former EMS shareholders had not yet received their Merger Consideration:

> Ben
>
> It's a process and we waited to have all the docs from all the shareholders *before we went to the [K]uwaiti government for validation of docs.*

Skancke then claimed in a subsequent telephone conversation with Van Roy on January 27, 2011 that Sakhr had not been able to transfer the Merger Consideration because it did not have sufficient proof of the value of EMS pre-merger to satisfy Kuwaiti governmental approval requirements.  During the same call, Skancke refused to provide Van Roy with copies of any correspondence between Sakhr and the Kuwaiti government that supported his governmental approval claim.

33.     From and after the January 27, 2011 telephone call and through the present date, Sakhr has failed and refused to release the Merger Consideration, first claiming for months following the closing that necessary approvals were in process, and later claiming that EMS was not worth the Merger Consideration, thus excusing Sakhr's refusal to perform.

**D.     The Plan of Merger.**

34.     Under the terms of the Merger Agreement, EMS agreed to merge with EXMS, Sakhr's wholly-owned subsidiary, with EMS to be the surviving company, EXMS's common stock converted into EMS common stock, and EMS's pre-merger common stock cancelled in exchange for a right to receive the Merger Consideration.

35.     The agreed value of the Merger Consideration was $14 million.

**E.     The False Representations in the Merger Agreement.**

36.     In the Merger Agreement, Sakhr, Sakhr Stock, and EXMS made the following representations and warranties, inter alia:

Section 4.3     Authority; Noncontrovention; Voting Requirements

(a) Each of the Parent [Sakhr], Distribution Sub [Sakhr Stock], and the Merger Sub [EXMS] has all necessary power and authority to execute and deliver this Agreement and the other Transaction Agreements to which it is a party and to perform its obligations hereunder and to consummate the Transactions.  The execution, delivery and performance by each of the Parent, Distribution Sub, and the Merger Sub of this

Agreement and the other Transaction Agreements to which it is a party, and the consummation by it of the Transactions, have been duly authorized and approved by their Boards of Directors or sole member, as the case may be, *and no other action on the part of the Parent, the Merger Sub or their stockholders or members is necessary to authorize the execution, delivery and performance by the Parent, Distribution Sub and the Merger Sub of this Agreement and the other Transaction Agreements to which it is a party and the consummation by it of the Transactions, subject only to the adoption of this Agreement by the Parent and the filing of the Certificate of Merger with the Secretary of State of the State of Delaware.*

\* \* \*

Section 4.4.   <u>Consents and Approvals</u>. *No consent, waiver, order, authorization or approval of any Governmental Authority* or any other Person, and no declaration or notice to or filing or registration with any Governmental Authority or any other Person *is required to be made, obtained, performed or given with respect to Parent in connection with the execution and delivery of this Agreement by Parent or the consummation by Parent of the transactions contemplated hereby or thereby,* except for the filing of the Certificate of Merger with the Secretary of State of the State of Delaware and the relevant authorities of other States in which Parent is qualified to do business.

Section 4.19   <u>Disclosure</u>. No representation or warranty in this Agreement ... contains or will contain any untrue statement of a material fact *or omits or will omit any material fact necessary to make the statements contained herein or therein, in light of the circumstances under which made, not misleading*.

(Emphasis supplied).

37.    Sakhr, Sakhr Stock and EXMS further covenanted to keep EMS and its shareholders "*informed in all material respects and on a reasonably timely basis of any material communication received by such party, or given by such party to, any Governmental Authority ... regarding any of the Transactions...*", and "*... to provide... upon request copies of all correspondence between such party and any Governmental Authorities relating to the Merger.*"

(Emphasis supplied).

38.    The representations in Sections 4.3, 4.4 and 4.19 were knowingly false when made because the defendants admitted after the Closing that they were unable to transfer the

Merger Consideration to the plaintiffs without first obtaining the approval of Kuwaiti governmental authorities.

F.    **The False Representations and Material Omissions in the Information Statement.**

39.    Sakhr represented in the section of the Information Statement labeled, "*Description of Parent [Sakhr] Capital Stock*", that Kuwait "regulates the conditions under which a non-Kuwaiti may obtain and own shares in a Kuwaiti corporation, as well as limiting the foreign purchaser to minority percentage ownership."

40.    Sakhr further represented in the Information Statement that that the distribution of the Merger Consideration to EMS shareholders would occur in the following manner in accordance with Kuwaiti law:

> Sakhr formed the Distribution Sub because under Kuwaiti law, the direct payment of Sakhr shares as Merger Consideration from Parent to the EMS Stockholders requires compliance with procedures which would greatly extend the amount of time required to complete the Merger. *In order to effect the delivery of the Merger Consideration [the Sakhr shares], upon Closing, existing Parent shareholders shall transfer the appropriate number of shares to Distribution Sub [Sakhr Stock] and Distribution Sub will be the delivery agent to the EMS Stockholders of the Merger Consideration,* as well as the corporate vehicle which will implement any Merger Consideration adjustments.

(Emphasis supplied).

41.    The Information Statement contained a comprehensive list of risk factors including:

- the possibility that Sakhr might assert "indemnity claims" arising out of breaches of EMS's representations and warranties,

- the fact that EMS shareholders' ability to transfer, sell, or borrow against their new shares in Sakhr would be limited after the merger,

- the fact that EMS would forego business opportunities that it might have if it remained a stand-alone company,

- the possibility that Sakhr might not be able to realize the anticipated benefits of the merger,

- the possibility that Sakhr might not be able to achieve business synergies resulting from the merger,

- the possibility that EMS could be negatively affected if the merger was not consummated,

- the possibility that EMS's officers and directors' personal interests in the merger might have affected their decision to support, approve, or recommend it, and

- the possibility that the merger might not receive the anticipated favorable US tax treatment.

42.     Nowhere in the Information Statement was there any suggestion that the Kuwaiti government was required to approve any aspect of the Merger, or that the Kuwaiti government might fail to give a required permission.  Sakhr's conscious omission of any Kuwaiti governmental approval risk factors in the Information Statement was consistent with Sakhr's multiple pre-closing representations that no such approvals were required, and the EMS shareholders relied to their detriment on Sakhr's risk factor omissions.

43.     Sakhr's representations and omissions in the Information Statement were false because the defendants claimed for the very first time post-closing that they were unable to transfer the Merger Consideration without first obtaining the approval of Kuwaiti governmental authorities, and without EMS shareholders first providing proof that their shares were worth $14,000,000 as of the date of the Closing.

G.   **Scienter.**

44.   At all times relevant hereto, the defendants knew that their representations in the Merger Agreement and the Information Statement were false and misleading, that EMS shareholders would reasonably rely upon Sakhr's representations in approving the proposed merger, and that the failure to note the risk of governmental non-approval was a material omission for which only Sakhr had access to the correct information.

45.   Sakhr, a Kuwaiti company, was advised by DLA Piper and Hogan & Hartson LLP (now Hogan Lovells), both major international law firms, and knew, or was reckless in not knowing, the requirements of Kuwaiti law concerning transfers of shares in Kuwaiti corporations to foreigners.

46.   Skancke represented Sakhr in connection with the proposed merger and negotiated the Letter of Intent.  Skancke repeatedly corresponded with the EMS shareholders on behalf of Sakhr during the merger. Skancke led Sakhr's due diligence of EMS, and Skancke served as the primary Sakhr contact for the EMS shareholders.  Through Skancke, Sakhr knew of, or was reckless in not knowing of, the requirements of Kuwaiti law concerning transfers of shares in Sakhr to the plaintiffs.

47.   Aside from the strong inference of scienter that arises from the circumstances alleged above, there is direct evidence that Sakhr and Skancke knew of the requirements of Kuwaiti law well before either the Information Statement was drafted or the Merger closed.

48.   In particular, in an e-mail from Skancke to Van Roy on April 8, 2010, Skancke admitted that the defendants were aware of the necessity of Kuwaiti governmental approvals at all times prior to the Closing:

> *Its a process and we waited to have all the docs from all the shareholders before we went to the kuwaiti government for validation of docs.*

*We knew this from the beginning* and aren't seeing it as delayed. For those who responded right away to the document request, it will seem like a long time though.

(Emphasis supplied).

49. At all relevant times, Skancke was an officer of Sakhr Stock, and Sakhr Stock was not an operating company. Skancke's knowledge is attributable to Sakhr Stock.

50. At all relevant times, Skancke was an officer of EXMS, and EXMS was not an operating company. Skancke's knowledge is attributable to EXMS.

51. At all relevant times, Skancke was an agent of Sakhr, and Skancke's knowledge is attributable to Sakhr.

**H.    Reliance**

52. In agreeing to the Merger, the plaintiffs reasonably relied upon the representations of Sakhr, Sakhr Stock, and EXMS, and on the representations of Sakhr in the Information Statement.

53. Had the defendants not repeatedly assured the plaintiffs that there was no risk that Kuwaiti governmental action or inaction might prevent Sakhr and Sakhr Stock from transferring the merger consideration to them, the plaintiffs would never have agreed to proceed with the Merger as proposed, but would instead have required a mechanism to guarantee that they would receive the Merger Consideration upon presenting their EMS stock.

**I.    The Merger Closing.**

54. The Merger closed on October 2, 2009.

55. At the Closing, Sakhr delivered opinions of legal counsel, including the opinion letter of DLA Piper, dated October 1, 2009, opining on "Kuwaiti law issues pertaining to the Merger Agreement, and in connection with the signatory power and execution of the Merger Agreement by [Sakhr]." The DLA Piper opinion letter opined that,

*"[Sakhr] has taken all necessary company and other actions necessary to authorize the execution, delivery and performance by it of the Merger Agreement and its obligations thereunder"*;

*"The execution and delivery by Sakhr of the Merger Agreement and the performance by Sakhr of its obligations under the Merger Agreement do not require on the part of Sakhr any consent, license, approval or authorization of any governmental or regulatory body or official of Kuwait which has not been obtained"*; and

*"No ... filing or registration is required, in connection with the execution, performance or enforcement of the Merger Agreement or any related instruments other than the nominal stamp duty payable to the Ministry of Justice ..."*

56.     The plaintiffs tendered their EMS stock certificates on the Closing Date in reliance on the representations and covenants made in the Information Statement, the Merger Agreement and the DLA Piper opinion letter.

57.     The plaintiffs have not received the Merger Consideration in return.

## J.     The Buyer Indemnity.

58.     Pursuant to the terms of the Merger Agreement, Sakhr agreed to indemnify and hold the EMS Stockholders and their successors and assigns harmless "from and against any and all Losses of such Person, directly or indirectly ... as a result of, or based upon, arising from or relating to, (i) any breach or violation of any of the representations or warranties, made by the [Sakhr, Sakhr Stock, or EXMS] in this Agreement ..."

59.     Under § 8.5 of the Merger Agreement, all EMS Stockholders (which includes both the plaintiffs and the EMS shareholders who have not joined as plaintiffs in this action) irrevocably authorized Benjamin Van Roy to assert claims for indemnification under the Merger Agreement.

60.     Van Roy provided the requisite Claim Notice pursuant to Article 8.4(a) of the Merger Agreement, and Sakhr failed to provide a proper Objection Notice or negotiate a resolution in good faith to resolve the dispute.

61.     By letter dated February 2, 2011, Van Roy terminated the Merger Agreement on

behalf of EMS shareholders and demanded damages in the amount of $14,000,000 (US) from the

Defendants.

62.     From and after the Notice of Termination, the Defendants have failed and refused

to pay the damages.

**COUNT 1**
**Securities Fraud**
**§ 10(b) of the Securities Act of 1934**
**(Against Sakhr, EMS, and Sakhr Stock)**

63.     The plaintiffs incorporate the allegations of paragraphs 1 to 62.

64.     Sakhr, EMXS, and Sakhr Stock made false material representations in the Merger

Agreement, namely:

> a.   The representation that "no other action on the part of the Parent, the
>       Merger Sub or their stockholders or members is necessary to authorize the
>       execution, delivery and performance by the Parent, Distribution Sub and
>       the Merger Sub of this Agreement and the other Transaction Agreements
>       to which it is a party and the consummation by it of the Transactions,
>       subject only to the adoption of this Agreement by the Parent and the filing
>       of the Certificate of Merger with the Secretary of State of the State of
>       Delaware" (§ 4.3); and
>
> b.   The representation that "No consent, waiver, order, authorization or
>       approval of any Governmental Authority or any other Person, and no
>       declaration or notice to or filing or registration with any Governmental
>       Authority or any other Person is required to be made, obtained, performed
>       or given with respect to Parent in connection with the execution and
>       delivery of this Agreement by Parent or the consummation by Parent of
>       the transactions contemplated hereby or thereby, except for the filing of
>       the Certificate of Merger with the Secretary of State of the State of
>       Delaware and the relevant authorities of other States in which Parent is
>       qualified to do business."

65.     Sakhr also omitted to state a material fact necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading.

In particular, Sakhr was the source of information concerning Sakhr in the Information

Statement, and the Information Statement expressly confirmed that information in the Information Statement concerning Sakhr *"had been provided by Sakhr*." The "Risk Factors" section of the Statement contains a discussion of many risk factors relating to Sakhr, but it did not contain any suggestion that the Kuwaiti government might not approve the transfer of the Merger Consideration to the plaintiffs.

66.     Sakhr also made additional false and misleading statements in the May 7, 2009 email forwarded to Shana'a when, in response to the question: "If we decide to go a different route, and redistribute existing Sakhr shares instead of issuing new ones, will this remove the need for the lengthy process?" its lawyer stated: "Yes.  There would be no lengthy process involved in such a scenario."

67.     Sakhr knew, or should have known, that EMS shareholders would rely on the representation that using existing Sakhr shares for the Merger Consideration would obviate the need for Kuwaiti governmental review and approval before the Merger Consideration could be distributed.

68.     Sakhr, EMXS, and Sakhr Stock's misrepresentations and omissions were knowing or reckless, and they acted with scienter.

69.     The misrepresentations were related to and connected with the Investor's purchase of shares in Sakhr and their sale of shares in EMS.

70.     The plaintiffs relied on the misrepresentations in making their decision to approve the Merger Agreement.

71.     The plaintiffs suffered an economic loss.

72.     Their loss was proximately caused by the misrepresentations.

73.     EMS is liable for the fraud of EXMS because it succeeded to all the liabilities of

EXMS.

**COUNT 2**
**Control Person Liability**
**§ 20(a) of the Securities Exchange Act of 1934**
**(Against Skancke and al Sharekh)**

74.     The plaintiffs incorporate the allegations of paragraphs 1 to 73.

75.     Skancke was the president of Sakhr Stock and EXMS Holdings.  He had control

of those entities.  On information and belief, he was a culpable participant in the violations of §

10 committed by Sakhr Stock and EXMS Holdings and is therefore jointly and severally liable

for those violations.

76.     Al Sharekh was effectively running the business of Sakhr at the time of the

transaction.  He had control of Sakhr. On information and belief, he was a culpable participant in

the violations of § 10 committed by Sakhr and is therefore jointly and severally liable for those

violations.

**COUNT 3**
**Securities Fraud**
**§§ 7303(2) and 7323(a) of the Delaware Securities Act**
**(Against Sakhr, EMS, and Sakhr Stock)**

77.     The plaintiffs incorporate the allegations of paragraphs 1 to 76.

78.     Sakhr, EMXS, and Sakhr Stock made misrepresentations in the Merger

Agreement, namely, the misrepresentations alleged in paragraph 45, Sakhr made a

misrepresentation in a May 7, 2009 email from its lawyer to Shana'a, as alleged in paragraph 47,

and Sakhr made a material omission, namely the omission alleged in paragraph 46.

79.     The misrepresentations and omissions were material.

80.     Sakhr, EMXS, and Sakhr Stock's misrepresentations and omissions were knowing or reckless, and they acted with scienter.

81.     The misrepresentations and omissions were related to and connected with the plaintiffs' purchase of shares in Sakhr and their sale of shares in EMS.

82.     The plaintiffs relied on the misrepresentations and omissions in making their decision to approve the Merger Agreement.

83.     The plaintiffs suffered an economic loss.

84.     Their loss was proximately caused by the misrepresentations and omissions.

85.     EMS is liable for the fraud of EXMS because it succeeded to all the liabilities of EXMS.

**COUNT 4**
**Control Person Liability**
**§ 7323(b) of the Delaware Securities Act**
**(Against Skancke and al Sharekh)**

86.     The Inventors incorporate the allegations of paragraphs 1 to 85.

87.     Skancke was, at all times relevant hereto, an officer of EXMS and Sakhr Stock and is liable for their violations of § 7323(a).

88.     Al Sharekh was, at all times relevant hereto, a control person with respect to Sakhr and is liable for its violations of § 7323(a).

**COUNT 5**
**Fraud**
**(Against Sakhr, EMS, and Sakhr Stock)**

89.     The Inventors incorporate the allegations of paragraphs 1 to 88.

90.     Sakhr, EMS, and Sakhr made misrepresentations in the Merger Agreement, namely the misrepresentations alleged in paragraph 45, Sakhr made a misrepresentation in a May 7, 2009 email from its lawyer to Shana'a, as alleged in paragraph 47, and Sakhr omitted to state a

material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, as alleged in paragraph 46.

91.    They knew that the representations and omissions were false or were indifferent to the truth.

92.    They made the misrepresentations and omissions with the intention to induce the plaintiffs to act, that is, to approve the Merger Agreement.

93.    The plaintiffs justifiably relied on the misrepresentations and omissions.

94.    The plaintiffs have been injured as a result of their reliance.

95.    EMS is liable for the fraud of EXMS because it succeeded to all the liabilities of EXMS.

**COUNT 6**
**Breach of Contract**
**(By Benjamin Van Roy, as Stockholders' Representative, Against Sakhr)**

96.    The plaintiffs incorporate the allegations of paragraphs 1 to 95.

97.    A contract existed between Sakhr and the Stockholders of EMS, represented by Benjamin Van Roy as Stockholders' Representative.

98.    Sakhr breached the contract by failing to indemnify the Stockholders from Company Indemnifiable Losses arising out of or relating to breaches or violations of the representations or warranties made by Sakhr, EXMS, or Sakhr Stock in the Merger Agreement.

99.    The Stockholders have been injured as a result of Sakhr's breach.

**COUNT 7**
**Breach of Contract**
**(Against Sakhr Stock)**

100.    The plaintiffs incorporate the allegations of paragraphs 1 to 99.

101.     A contract existed between Sakhr Stock and the plaintiffs, represented by Benjamin Van Roy as Stockholders' Representative.

102.     Sakhr Stock breached the contract by failing to deliver the Merger Consideration to the plaintiffs, as required by the Merger Agreement.

103.     The plaintiffs have been injured as a result of Sakhr Stock's breach.

## DEMAND FOR RELIEF

Therefore, the plaintiffs demand judgment against the defendants for the following relief:

1.     Rescission of the Merger Agreement and an order requiring the defendants to pay the plaintiffs the sum of $10,281,892, the value of the consideration paid by the plaintiffs for the shares of Sakhr stock, with interest;

2.     Damages against Sakhr in the amount of $14,000,000, the value of the consideration paid by the Stockholders for the shares of Sakhr stock, with interest;

3.     Damages against Sakhr Stock in the amount of $10,281,892, with interest; and

4.     Costs, and such other relief to which they may be entitled at law or in equity.

## DEMAND FOR TRIAL BY JURY

The plaintiffs demand a trial by jury.

ASHBY & GEDDES

John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
jday@ashby-geddes.com
tlydon@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Plaintiffs*

*Of Counsel:*

Daniel J. Lyne
Theodore J. Folkman
Ryan E. Ferch
MURPHY & KING, P.C.
One Beacon St.
Boston, MA  02108
(617) 423-0400

Dated: September 23, 2011