IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BENJAMIN VAN ROY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No. 11-863-LPS |
| | ) | |
| v. | ) | |
| | ) | |
| SAKHR SOFTWARE CO. (K.S.C.C.), et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

ASHBY & GEDDES
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
jday@ashby-geddes.com
tlydon@ashby-geddes.com
lmaguire@ashby-geddes.com

*Of Counsel:*

Daniel J. Lyne
Theodore J. Folkman
Ryan E. Ferch
MURPHY & KING, P.C.
One Beacon St.
Boston, MA 02108
(617) 423-0400
djl@murphyking.com
tjf@murphyking.com
ref@murphyking.com

*Attorneys for Plaintiffs*

Dated: May 14, 2012

{00631210;v1 }

## TABLE OF CONTENTS

Nature and Stage of the Proceedings ................................................................................. 1

Summary of the Argument................................................................................................ 2

Facts ................................................................................................................................. 3

    A.   The Business Case For The Merger................................................................... 3

    B.   The Structure of the Transaction....................................................................... 3

    C.   The Merger Agreement..................................................................................... 5

    D.   The Denouement................................................................................................ 6

Argument .......................................................................................................................... 6

    A.   Only Some Of The Counts Carry A Heightened Pleading Burden. ................... 6

    B.   The Shareholders Have Stated A Claim For Securities Fraud Under The 1934 Act.......... 8

        1.   The Defendants' Statements Were Material And False. ................................ 9

        2.   The Defendants Acted With Scienter.......................................................... 19

    C.   The Shareholders Have Stated Claims For Common Law Fraud And Securities Fraud Under Delaware Law. .................................................................................. 24

        1.   Fraud........................................................................................................... 24

        2.   Delaware Securities Act .............................................................................. 25

    D.   The Shareholders Have Stated Claims For Control Person Liability ............................. 25

        1.   Culpable Participation and the Federal Claim.............................................. 26

        2.   The Delaware Claim.................................................................................... 27

    E.   The Court Should Exercise Subject-Matter Jurisdiction ................................. 28

        1.   The Court Should Exercise Supplemental Jurisdiction................................ 28

        2.   In The Alternative, The Court Should Grant Leave To Amend The Complaint To Assert Diversity Jurisdiction .................................................................. 29

    F.   The Court Has Personal Jurisdiction Over Al Sharekh. .................................. 29

        1.   Al Sharekh's Contacts With The United States ........................................... 30

    2.   Al Sharekh's Argument Fails. ........................................................................................ 32

Conclusion ................................................................................................................................. 35

ii

## TABLE OF AUTHORITIES

### Cases

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ............................................................................. 7, 24, 25

*Carnegie-Mellon Univ. v. Cohill,*
   484 U.S. 343 (1988) ................................................................................ 28

*City of Roseville Employees Ret. Sys. v. Horizon Lines, Inc.,*
   442 Fed. Appx. 672 (3d Cir. 2011) ........................................................ 21

*Colvin v. Van Wormer Resorts, Inc.,*
   417 Fed. Appx. 183 (3d Cir. 2011) ........................................................ 31

*Derensis v. Coopers & Lybrand Chartered Accountants,*
   930 F. Supp. 1003 (D.N.J. 1996) ........................................................... 34

*Frederico v. Home Depot,*
   507 F.3d 188 (3d Cir. 2007) ............................................................... 7, 24

*FS Photo, Inc. v. PictureVision, Inc.,*
   48 F. Supp. 2d 442 (D. Del. 1999) ......................................................... 34

*Gould Elecs., Inc. v. United States,*
   220 F.3d 169 (3d Cir. 2000) ................................................................... 28

*Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.,*
   988 F.2d 476 (3d Cir. 1993) ................................................................... 31

*Henglein v. Informal Plan for Plant Shutdown Benefits for Salaried Employees,*
   974 F.2d 391 (3d Cir. 1992) ................................................................... 28

*Hubbard v. Hibbard Brown & Co.,*
   633 A.2d 345 (Del. 1993) ....................................................................... 25

*In re Adams Golf, Inc. Sec. Litig.,*
   381 F.3d 267 (3d Cir. 2004) ................................................................... 17

*In re Advanta Corp. Sec. Litig.,*
   180 F.3d 525 (3d Cir. 1999) ............................................................... 8, 19

*In re Aetna, Inc. Sec. Litig.,*
   617 F.3d 272 (3d Cir. 2010) ................................................................... 16

{00631210;v1 }

*In re Baan Co. Sec. Litig.,*
    245 F. Supp. 2d 117 (D.D.C. 2003) .................................................................. 34

*In re Constar Int'l Inc. Sec. Litig.,*
    585 F.3d 774 (3d Cir. 2009) ............................................................................... 9

*In re Digital Island Sec. Litig.,*
    223 F. Supp. 2d 546 (D. Del. 2002) .......................................................... 26, 27

*In re Donald J. Trump Casino Sec. Litig.,*
    7 F.3d 357 (3d Cir. 1993) ................................................................................. 18

*In re NAHC, Inc. Sec. Litig.,*
    306 F.3d 1314 (3d Cir. 2002) ........................................................................... 19

*In re Reliance Sec. Litig.,*
    135 F. Supp. 2d 480 (D. Del. 2001) ................................................................. 27

*In re Royal Ahold N.V. Sec. & ERISA Litig.,*
    351 F. Supp. 2d 334 (D. Md. 2004) .................................................................. 34

*In re Splash Tech. Holdings, Inc. Sec. Litig.,*
    2000 WL 1727377 (N.D. Cal. Sept. 29, 2000) ................................................. 26

*In re Sprint Corp. Sec. Litig.,*
    232 F. Supp. 2d 1193 (D. Kan. 2002) .............................................................. 19

*In re Suprema Specialties, Inc. Sec. Litig.,*
    438 F.3d 256 (3d Cir. 2006) ............................................................................. 26

*In re Washington Mut., Inc.,*
    462 B.R. 137 (Bankr. D. Del. 2011) ................................................................ 26

*In re Westinghouse Sec. Litig.,*
    90 F.3d 696 (3d Cir. 1996) ............................................................................... 17

*Institutional Investors Group v. Avaya, Inc.,*
    564 F.3d 242 (3d Cir. 2009) ............................................................................... 8

*Jones v. Intelli-Check, Inc.,*
    274 F. Supp. 2d 615 (D.N.J. 2003) .................................................................. 26

*Key Equity Investors, Inc. v. Sel-Leb Mktg., Inc.,*
    246 Fed. Appx. 780 (3d Cir. 2007) .................................................................. 23

iv

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
   513 F.3d 702 (7th Cir. 2008) ................................................................ 21

*McCabe v. Ernst & Young, LLP,*
   494 F.3d 418 (3d Cir. 2007).................................................................. 8

*Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC,*
   2003 WL 22882137 (S.D.N.Y. Dec. 4, 2003) ...................................... 35

*Newman-Green, Inc. v. Alfonzo-Larrain,*
   490 U.S. 826 (1989)............................................................................. 29

*Pemberton v. Colonna,*
   290 F.2d 220 (3d Cir. 1961)................................................................ 29

*Pet Quarters, Inc. v. Badian,*
   2006 WL 2265253 (E.D. Ark. Aug. 7, 2006) ...................................... 35

*Pinker v. Roche Holdings Ltd.,*
   292 F.3d 361 (3d Cir. 2002)................................................................ 30

*Pittsburgh Terminal Corp. v. B & O R. Co.,*
   680 F.2d 933 (3d Cir. 1982)................................................................ 23

*Rick v. Women's & Children's Hosp.,*
   2010 WL 2360703 (W.D. La. May 10, 2010) ...................................... 29

*Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC,*
   650 F. Supp. 2d 1213 (S.D. Fla. 2009) ............................................... 34

*Snowstorm Acquisition Corp. v. Tecumseh Prods. Co.,*
   739 F. Supp. 2d 686 (D. Del. 2010)........................................... 32, 33, 34

*Southland Secs. Corp. v. INSpire Ins. Solutions Inc.,*
   365 F.3d 353 (5th Cir. 2004) .............................................................. 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007)......................................................................... 8, 23

*Toys "R" Us, Inc. v. Step Two, S.A.,*
   318 F.3d 446 (3d Cir. 2003)................................................................ 35

*United Mine Workers of Am. v. Gibbs,*
   383 U.S. 715 (1966)............................................................................. 28

{00631210;v1 }

*Weiner v. Quaker Oats Co.,*
  129 F.3d 310 (3d Cir. 1997)...........................................................................17

*Winer Family Trust v. Queen,*
  503 F.3d 319 (3d Cir. 2007)...........................................................................20

### Statutes

28 U.S.C. § 1367.........................................................................................28

Del. Code Ann. tit. 8 § 103(d) ....................................................................14

Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j .........................8

Securities Exchange Act of 1934 § 12, 15 U.S.C. § 78*l* ............................16

Securities Exchange Act of 1934 § 13, 15 U.S.C. § 78m ...........................16

Securities Exchange Act of 1934 § 15, 15 U.S.C. § 78o ............................16

Securities Exchange Act of 1934 § 21D, 15 U.S.C. § 78u-4 ...........8, 23, 25

Securities Exchange Act of 1934 § 21E, 15 U.S.C. § 78u-5 .....................15

Securities Exchange Act of 1934 § 27, 15 U.S.C. § 78aa....................30, 33

### Rules

Fed. R. Civ. P. 21.......................................................................................29

Fed. R. Civ. P. 4...................................................................................29, 30

Fed. R. Civ. P. 8...........................................................................................7

Fed. R. Civ. P. 9......................................................................................7, 25

### Treaties and Related Materials

DLA Piper Middle East, LLP, *Business Law of Kuwait and Qatar* § 2.32 ...................12

John P. Sinnott, *Practical Guide to Document Authentication* § 1:108 .......................12

{00631210;v1 }

<u>NATURE AND STAGE OF THE PROCEEDINGS</u>

The wrong in this case is easy to see. Sakhr Software Co. ("Sakhr") offered to buy all of the outstanding stock of Excuse Me Services, Inc. ("EMS") in return for $14 million worth of Sakhr stock. The parties signed a merger agreement, the EMS shareholders tendered their stock, Sakhr took the stock and thus EMS's intellectual property … and then paid the EMS shareholders ("the Shareholders") nothing. Now Sakhr has EMS's stock and assets, and the EMS shareholders have nothing in return.

Sakhr and an entity it set up in connection with the merger, Sakhr Stock, LLC ("Sakhr Stock") plainly breached their contract. In fact, the defendants do not even argue that the plaintiff shareholders have failed to plead a claim for relief on a contractual theory. But the wrong in this case is not just a broken contract. It is a fraud in the sale of securities. Sakhr, Sakhr Stock, and another entity Sakhr set up for the merger, EXMS Holdings Corp. ("EXMS")[1]—represented to the Shareholders that no Kuwaiti governmental approval would be required as a condition precedent of the transfer of the promised shares of Sakhr's stock. But Sakhr always knew that Kuwaiti government approval was going to be required. And unsurprisingly, given the fraud, it was not forthcoming. More than two years after the closing, the Shareholders still have not received anything in return for the $14 million in stock they tendered to Sakhr.

_____

[1] EXMS merged with EMS as part of the merger transaction, with EMS as the surviving entity. (D.I. 1 ¶ 34). Therefore, EMS rather than EXMS is a defendant in this action, though only as successor in interest to EXMS and not on account of anything EMS did or failed to do before the merger.

The defendants have moved to dismiss.[2] They focus on alleged pleading deficiencies, and, with regard to one defendant (Fahad Al Sharekh, a Kuwaiti and an officer of Sakhr) on a supposed lack of sufficient contacts with the forum to support the exercise of personal jurisdiction. But the Complaint meets the applicable pleading requirements, and Al Sharekh's actions bring him squarely within the reach of this Court's jurisdiction. The defendants' motion should be denied.

## SUMMARY OF THE ARGUMENT

1.      The PSLRA's heightened pleadings standards apply only to the federal securities fraud count.

2.      The Shareholders have stated a claim for relief under the Securities Exchange Act. The defendants' misrepresentations were material. There is direct evidence that the defendants had a fraudulent scienter, and that evidence is stronger than any competing inference. The PSLRA safe harbor does not apply. No specific cautionary statement brings the bespeaks caution doctrine into play. The complaint does not show that the defendants' reliance on counsel negates scienter.

3.      The claims for common law fraud and violations of the Delaware Securities Act easily meet the requirements of Rule 9(b).

4.      The Shareholders are not required to plead culpable participation to plead a control person claim, and even if they were, they have sufficiently pleaded culpable participation.

---

[2] Footnote 1 of the defendant's memorandum misrepresents the procedural history: it was the defendants' counsel who proposed, in writing, Monday, January 16 as a final deadline for answering the complaint after agreeing to and then ignoring earlier agreed deadlines.

5.      The Court should exercise supplemental jurisdiction in the event it dismisses the federal securities law claim, or in the alternative, the Court should grant leave to amend the complaint to allege diversity jurisdiction.

6.      The Court has personal jurisdiction over Fahad Al Sharekh based on his relevant contacts with the United States, and it can exercise pendant personal jurisdiction.

## FACTS

### A.      The Business Case For The Merger

Excuse Me Services, Inc. ("EMS") was a US technology company that developed and sold mobile applications and cloud-based speech recognition technologies. (D.I. 1 ¶ 12). EMS's products included "Dial Directions," which allowed a phone user to dial a phone number, speak an address, and receive an SMS message with directions to a destination. (Id.). The plaintiffs in this case are former EMS shareholders. (D.I. 1 ¶ 4).

Sakhr Software Co. ("Sakhr") is a Kuwaiti software company specializing in Arabic language technology, including translation between Arabic and English. (D.I. 1 ¶ 13). Sakhr wanted to combine EMS's voice recognition technology into Sakhr's translation products to allow for real-time translation between Arabic and English on smart phones. In 2009, EMS began partnering with Sakhr Software USA, Inc., Sakhr's wholly-owned US subsidiary, to create new real-time translation applications. (D.I. 1 ¶ 14). The collaboration between Sakhr and EMS was successful enough that Sakhr wanted to buy EMS. That led to merger discussions, and a letter of intent for a proposed $14 million all-stock acquisition. (D.I. ¶ 15).

### B.      The Structure of the Transaction

To consummate the merger, Sakhr created a wholly-owned subsidiary, EXMS Holdings, Inc. ("EXMS"), a Delaware corporation, to merge with EMS, with EMS as the surviving entity.

3

The shareholders of EMS were to tender their shares of EMS stock to Sakhr, and Sakhr was to tender shares of its own stock to the selling shareholders of EMS. (D.I. 1 ¶ 34).

There was, however, one crucial point that the parties negotiated extensively, namely, whether Kuwaiti governmental authorities would require any form of pre-merger substantive review. (D.I. 1 ¶ 17). There were two possibilities: first, Sakhr could issue new shares which it would exchange with the Shareholders in return for their shares of EMS; or second, Sakhr could transfer already *issued and outstanding shares*. (D.I. 1 ¶ 20).

At Al Sharekh's instruction, Sakhr provided EMS with otherwise privileged communications between two Sakhr lawyers, Abdul Aziz Al-Yaqout, Richard K.A. Becker. (D.I. 1 ¶ 18-21). The communication represented that if Sakhr issues *new* shares, then "an independent valuer appointed by the [Kuwaiti] Court of First Instance" would be required. (D.I. 1 ¶ 20). But if Sakhr distributed *existing* Sakhr shares, "[t]here would be no lengthy process involved in such a scenario." (D.I. 1 ¶ 20). The Al-Yaqout/Becker communication was a material inducement to EMS shareholders to agree to a merger. (D.I. 1 ¶ 22-23).

The parties prepared an Information Statement. (D.I. 1 ¶ 24). The information about Sakhr in the Information Statement was provided by Sakhr. (D.I. 1 ¶ 25).[3] The Information Statement further stated that "promptly following receipt of your [EMS] stock certificates ... [Sakhr] will pay and deliver to you the stock consideration you are entitled to receive as a result of the Merger" (D.I. 1 ¶ 29), and that "[Sakhr] shall cause Distribution Sub [Sakhr Stock] to be

---

[3] The Introduction to the Information Statement read, in relevant part, "[i]nformation contained in this Information Statement regarding EMS has been provided by EMS *and information contained in this Information Statement regarding Parent [Sakhr] has been provided by Parent*." (D.I. 28 Ex. A at 4) (emphasis added).

4

capitalized with a sufficient number of [Sakhr] shares to effect the Merger and distribution of Merger Consideration." (Id.).

The Information Statement also contained a lengthy list of risk factors (D.I. 28 Ex. A at 16-19), including risk factors that refer directly to the fact that the Shareholders were not Kuwaitis (e.g., the risk that, as Americans, they might face adverse tax consequences from the transaction). Indeed, the Information Statement also explained how the use of the Sakhr Stock as a distribution sub would prevent delays due to Kuwaiti legal requirements. (D.I. 28 Ex. A at 14). *There was no reference in the Information Statement concerning any risk that the Kuwaiti authorities would either substantively review, or might not approve, the merger.*

C.    The Merger Agreement

The Shareholders bargained for specific contract representations from Sakhr, Sakhr Stock, and EXMS. (D.I. 28 Ex. C at 24). All three entities specifically represented:

> no other action on the part of the Parent [Sakhr], the Merger Sub [EXMS] or their stockholders or member is necessary to authorize the execution, delivery and performance by the Parent, Distribution Sub and the Merger Sub of this Agreement and the other Transaction Agreement to which it is a party and the consummation by it of the Transactions, subject only to the adoption of this Agreement by the Parent and the filing of the Certificate of Merger with the Secretary of State of the State of Delaware.

(D.I. 28 Ex. C at 26). And on the central point in the case, they expressly represented:

> No consent, waiver, order, authorization or approval of any Governmental Authority or any other Person, and no declaration or notice to or filing or registration with any Governmental Authority or any other Person is required to be made, obtained, performed or given with respect to Parent in connection with the execution and delivery of this Agreement by Parent or the consummation by Parent of the transaction contemplated hereby or thereby, except for filing of the Certificate of Merger with the Secretary of State of the State of Delaware and the relevant authorities of other states in which Parent is qualified to do business.

(Id. at 27).

{00631210;v1 }

The Shareholders, assured by these representations among others, entered into the Merger Agreement as of June 22, 2009 (the merger closed on October 2), tendering their EMS shares as required by the Agreement. (D.I. 1 ¶¶ 54, 56).

D.    The Denouement.

What followed was hardly subtle: Sakhr and Sakhr Stock took the Plaintiffs' stock and then refused to deliver the Merger Consideration. (D.I. 1 ¶¶ 56-57). Their brief conjures an excuse: they say that Kuwaiti law required Adeeb Shana'a, an officer of EMS before the sale, "to provide documents regarding an offer to acquire EMS that the latter had allegedly received prior to the offer from Sakhr Software." (D.I. 27 at 8). But there were no covenants imposing such an obligation in the Merger Agreement, which itself contained an integration clause (D.I. 28 Ex. C at 58), EMS made no representations regarding its valuation in the Merger Agreement, and in any event Sakhr did its own due diligence, and came to its own conclusions, before determining what price to offer for EMS. But in any event, the defendants admit that they informed the Shareholders after the Closing that Kuwaiti approval *was* required, and that the lack of Kuwaiti approval was the reason for their failure to perform. (D.I. 1 ¶ 38; D.I. 27 at 8).

At the end of the day, Sakhr stripped the Shareholders of their EMS stock and paid nothing for it. (D.I. 1 ¶¶ 56-57). Today, Sakhr advertises its "Mobile S2S Arabic Translator," which it says "enables live communication between English and Arabic speakers." Discovery will demonstrate the extent to which Sakhr has stolen EMS intellectual property.

## ARGUMENT

A.    Only Some Of The Counts Carry A Heightened Pleading Burden.

Much of the defendants' memorandum argues whether the Complaint meets the standards of the Private Securities Litigation Reform Act of 1995 ("the PSLRA"). But the PSLRA's heightened pleading standards apply only to the Shareholders' securities fraud claim under

6

federal law. Even under the heightened standard, the Shareholders have pleaded a claim on which relief can be granted. We briefly review the standards applicable to pleading each count.

*First,* all of the counts are subject to the ordinary pleading standard. To survive a motion to dismiss, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). That is, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility "is not akin to a probability requirement." Rather, plausibility simply requires "more than sheer possibility that a defendant has acted unlawfully." *Id.*

*Second,* the claims of common law fraud (count 5) and securities fraud (counts 1 and 3) must satisfy the requirements of Rule 9(b), which requires the Shareholders to "state with particularity the circumstances constituting fraud", though "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The requirement is that the complaint "allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot,* 507 F.3d 188, 200 (3d Cir. 2007).

*Third,* the *federal* securities fraud claim (count 1)—but not the *Delaware* securities fraud claim (count 3)—must satisfy the requirements of the PSLRA. Under the PSLRA, the complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."

7

The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Securities Exchange Act of 1934 § 21D(b), 15 U.S.C. § 78u-4(b). The Court must weigh the competing inferences the parties seek to draw from the evidence of scienter and determine whether the plaintiffs' inference is "cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 314 (2007). In the Third Circuit, a plaintiff can plead scienter sufficiently by alleging facts that constitute circumstantial evidence of either reckless or conscious misbehavior. *See In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 534-35 (3d Cir. 1999).[4]

B.    The Shareholders Have Stated A Claim For Securities Fraud Under The 1934 Act.

A securities fraud claim under § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) has six elements: (1) material misrepresentation; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *McCabe v. Ernst & Young, LLP,* 494 F.3d 418, 424 (3d Cir. 2007). The defendants challenge the sufficiency of the complaint only on the first two of these six elements. But the complaint easily meets the pleading requirements, and because the defendants raise similar objections to the sufficiency of the complaint on each of the other counts they challenge, the sufficiency of the § 10(b) allegations shows that the defendants' motion to dismiss for failure to state a claim must be denied altogether.

---

[4] *Advanta* also refers to pleading motive and opportunity. *Tellabs* overruled *Advanta* in part insofar as motive and opportunity *alone* are no longer sufficient, *see Institutional Investors Group v. Avaya, Inc.,* 564 F.3d 242, 276-77 (3d Cir. 2009), but here the Shareholders do not seek to plead scienter through proof of motive and opportunity alone.

8

1.     The Defendants' Statements Were Material And False.

The Shareholders allege that the defendants falsely represented that there was no requirement of Kuwaiti governmental approval as a condition of the merger. But the defendants later admitted that Kuwaiti government approval *was* required in order to transfer the Sakhr shares to the Shareholders. (D.I. 1 ¶ 38), and the defendant, Steven Skancke, has admitted that the defendants always knew that such approvals would be required. (*"Its a process and we waited to have all the docs from all the shareholders before we went to the kuwaiti government for validation of docs. **We knew this from the beginning** and aren't seeing it as delayed."*) (D.I. 1 ¶48) (emphasis added).

Statements and omissions are "material" if there is a "substantial likelihood that a reasonable shareholder would consider [them] important in making an investment decision." *In re Constar Int'l Inc. Sec. Litig.,* 585 F.3d 774, 783 (3d Cir. 2009) (citation omitted). Here, the parties plainly regarded the issue of Kuwaiti governmental review of the merger as highly important: they discussed possible merger structures with that issue in mind (D.I. 1 ¶ 17), and the defendants selected the structure that, according to Sakhr, would not require Kuwaiti governmental approval. (D.I. 1 ¶ 18-20). Indeed, the Shareholders affirmatively bargained for a structure that avoided the need for Kuwaiti governmental approval, *precisely because* it avoided the need for such approval. (D.I. 1 ¶ 22). The Shareholders' desire to avoid a deal that would require Kuwaiti government approval was self-evidently reasonable, and the defendants, knowing *"from the beginning"* that governmental approvals would be required, intentionally misrepresented the facts to induce the Shareholders to tender their stock.

{00631210;v1 }

a.      The Merger Agreement

The defendants collaterally attack the key representations in the Merger Agreement, asserting, for example, that other representations rob the key representations of their force, or that the key representations were immaterial. All of those fail.

i.      The Defendants' Representations

In Section 4.3 of the Merger Agreement, labeled "Authority; Noncontravention; Voting Requirements," Sakhr, Sakhr Stock, and EXMS represented that all three entities had authority to consummate the merger and that:

> no other action on the part of the Parent [Sakhr], the Merger Sub [EXMS] or their stockholders or members is necessary to authorize the execution, delivery and performance by the Parent, Distribution Sub and the Merger Sub of this Agreement and the other Transaction Agreement to which it is a party and the consummation by it of the Transactions, subject only to the adoption of this Agreement by the Parent and the filing of the Certificate of Merger with the Secretary of State of the State of Delaware.

(D.I. 1 ¶ 36; D.I. 28 Ex. C at 26).

In Section 4.4, labeled "Consents and Approvals," they represented:

> No consent, waiver, order, authorization or approval of any Governmental Authority or any other Person, and no declaration or notice to or filing or registration with any Governmental Authority or any other Person is required to be made, obtained, performed or given with respect to Parent in connection with the execution and delivery of this Agreement by Parent or the consummation by Parent of the transactions contemplated hereby or thereby, except for filing of the Certificate of Merger with the Secretary of State of the State of Delaware and the relevant authorities of other States in which Parent is qualified to do business.

(Id.; D.I. 28 Ex. C at 27). Each of the above representations were false when made because, as the defendants later admitted (D.I. 1 ¶ 38), they knew "*from the beginning*" that Kuwaiti government approval *was* required before shares could be transferred.

ii.   The Parent Disclosure Statement Has No Effect On The
Defendants' Representations

Article 4 of the Merger Agreement provided for a Parent Disclosure Schedule that

contained exceptions to the representations in the Merger Agreement. But a statement in the

Parent Disclosure Schedule would constitute an exception to one of the express representations

only if the statement is set forth in the Parent Disclosure Statement "with specific reference to

the Section or subsection of [the Merger Agreement] to which the information stated in [the

Parent Disclosure Statement] relates." (D.I. 28 Ex. C at 24). In other words, the Parent

Disclosure Statement could modify an express representation only if it said it was doing so.

The Parent Disclosure Statement contains a list of documents that are required for the

transfer of shares to an American limited liability company, and a list of documents that are

required for the transfer of shares to an American corporation. (D.I. 28 Ex. F at 6).[5] But in the

case where the "new shareholder is an individual," instead of listing required documents, the

Parent Disclosure Statement says, cryptically: "*[Insert requirements for individuals]*." (D.I. 28

Ex. F at 6) (emphasis in original).

In "both cases" (presumably the Parent Disclosure Statement means to say "in all three

cases", since it refers to LLCs, corporations, and individuals), the specified documents are to be

"approved by [the] State of Kuwait embassy in the United States [and] the [M]inistry of

[F]oreign [A]ffairs in [the] [S]tate of Kuwait." (Id.). But that requirement can hardly apply in the

case of individuals, as *no documents* were specified in the Parent Disclosure Schedule.

Since under § 2.1(c) of the Merger Agreement it was the sellers of the EMS shares who

were promised the right to receive shares in Sakhr (D.I. 28 Ex. C at 4), and since all of the

_____

[5] In both cases, the required documents are ministerial, e.g., the "memorandum of association",
the "commercial register", the "commercial license", documents identifying the members (in the
case of an LLC) or directors (in the case of a corporation), etc. (D.I. 28 Ex. F at 6).

11

Shareholders who are plaintiffs in this action are natural persons,[6] it follows that the statement in the portion of the Parent Disclosure Statement that relates to the representation of Section 4.3 of the Merger Agreement is *meaningless* in the context of this case, since even on its face it does *not* say that any individual need provide documents. A shareholder of EMS reading the Parent Disclosure Statement before agreeing to the Merger Agreement might think that the defendants' representations in Section 4.3 were modified if the shareholder was a corporation or a limited liability company, but the shareholder would have no reason to think the representations had been modified if the shareholder was a natural person.

In any event, even if the provisions of the Parent Disclosure Statement relating to the representations in Section 4.3 of the Merger Agreement did require the Shareholders to provide documents, they plainly did not give the Shareholders notice that the Kuwaiti authorities would need to approve the transfer of shares. The Parent Disclosure Schedule appears to refer to a requirement that the documents be legalized, or authenticated, for use in Kuwait. *See generally* John P. Sinnott, *Practical Guide to Document Authentication* § 1:108 (describing generally the process of legalizing documents for use in Kuwait). This is evident from the context—of course neither the Kuwaiti embassy nor the Ministry of Foreign Affairs would have any role in substantive review of a merger where foreign ownership is at issue. A relevant treatise suggests that the Ministry of Commerce and Industry may have a role in some cases. *See* DLA Piper Middle East, LLP, *Business Law of Kuwait and Qatar* § 2.32 n.2. But that is not what is disclosed in the Parent Disclosure Schedule.

---

[6] There is one exception, Roebuck Associates LLP, a Massachusetts limited partnership; but Roebuck Associates is neither a limited liability company nor a corporation, the two types of entities contemplated in the portion of the Parent Disclosure Schedule that relates to the representations in Section 4.3 of the Merger Agreement.

Moreover, the shareholder would have no reason to think that the representations in Section 4.4—*the representation relating specifically to governmental approvals*—were affected at all by the Parent Disclosure Statement because it specifically states that no consents or approvals were required to consummate the Merger. (D.I. 28 Ex. F at 8).

To be sure, under the Merger Agreement a statement in the Parent Disclosure Statement can modify an express representation if it would be "readily apparent to a reasonable person from the actual text of the disclosed exception" that it referred to a particular representation, even if it did not name the representation. (D.I. 28 Ex. C at 24). But that provision can hardly apply here, because the Parent Disclosure Statement expressly and specifically states that it contains *no* exceptions to the representations in Section 4.4 of the Merger Agreement. (D.I. 28 Ex. F at 8).

Given the specificity of this statement, it can hardly be obvious to anyone that the statement referring to approval of documents by the Kuwaiti embassy and Ministry of Foreign Affairs could have any bearing on the representations in Section 4.4 of the Merger Agreement, even if that statement had any bearing on a case such as this, where the Sakhr shares were to be transferred to individuals.

### iii.   The Requirement of Filing a Certificate of Merger

The defendants point out that ¶ 4.4 of the Merger Agreement refers to the filing of a certificate of merger with the "relevant authorities of other states in which [Sakhr] is qualified to do business" (D.I. 28 Ex. C at 27), and they argue that because Sakhr did business in Kuwait, the representation, on its face, requires the filing of documents with the Kuwaiti government.

That may be; but a requirement that a document be *filed* with the Kuwaiti authorities is *not* a requirement that the document be *approved* by the Kuwaiti authorities before the merger can be consummated, any more than the requirement in the very same paragraph that the Certificate of Merger be filed with the Secretary of State of Delaware is a requirement that the

13

Certificate be approved by the Secretary. *See* Del. Code Ann. tit. 8 § 103(d) (certificate of merger becomes effective when filed in accordance with the requirements of the statute).

In short, the defendants want the Court to conclude that a warning that a document had to be filed to become effective is equivalent to a warning that the office with which the document was to be filed *would review* and *could reject* the underlying transaction. That is plainly contrary not just to elementary corporate law, where documents such as certificates of merger become effective upon filing, but to many similar areas of the law, where the act of filing a document is what makes the document effective (e.g., filing documents affecting title to land with a registry of deeds; filing documents relating to security interests in personal property with the appropriate office).

b.  The Information Statement

The Information Statement has a glaring omission: despite the comprehensive list of risk factors it identifies, the Statement does not identify the risk of Kuwaiti non-approval as a risk the Shareholders faced.

As with the representations in the Merger Agreement, the defendants do not really explain the absence of Kuwaiti government approval as a risk factor. Instead, they argue two contradictory points: (1) that other risk factors disclosed in the Information Statement made the risk clear; and (2) that the risk involved the kind of speculative future event that the defendants were not required to disclose.

i.  The Other Risk Factors

None of the other risk factors the defendants note (D.I. 27 at 15-16) make the point the defendants want to make. Even if some "documentation [was] required by applicable Kuwaiti law" (D.I. 28 Ex. A at 26)—a point that, as shown above, the Parent Disclosure Statement does

14

not address—there was no indication in the Information Statement that the shares might not be forthcoming once the documents were provided.

The warning about the consequences of "failure to return the related documents" (D.I. 28 Ex. A at 9) is to the same effect. The Information Statement also warns that "Kuwait regulates the conditions under which a non-Kuwaiti may obtain and own shares in a Kuwaiti corporation." (D.I. 28 Ex. A at 13). But as already shown, the Shareholders specifically bargained for a deal structure in which, *according to the defendants*, this would not be an issue.[7] In short, the defendants are pointing to risk factors that did nothing to alert the Shareholders to the risk that what ended up happening was a risk they faced.

ii.     The Omission Is Not Protected By The Safe Harbor

The defendants rely on two last-ditch doctrines to protect them from the consequences of their omission. Even if they made a material omission, they say, the omission was within the PSLRA's safe harbor for forward-looking statements and is also within the scope of the common law "bespeaks caution" doctrine. Neither contention works.

The PSLRA safe harbor, codified in § 21E(c)(1)(B)(i) of the Securities Exchange Act, 15 U.S.C. § 78u-5(c)(1)(B)(i), provides a safe harbor for a "forward-looking statement" if the plaintiff fails to prove that the statement was made "with actual knowledge ... that the statement was false or misleading." But the safe harbor applies only to statements made by an issuer subject to the reporting requirements of Sections 13(a) or 15(d) of the Securities Exchange Act. *See id.* § 21E(a)(1), 15 U.S.C. § 78u-5(a)(1). Section 13(a) of the Act applies to an issuer of "a security registered pursuant to section 12." Securities Exchange Act of 1934, § 13(a), 15 U.S.C.

---

[7] The defendants also refer (D.I. 27 at 16) to the provisions of the Merger Agreement and the Parent Disclosure Statement that we dispose of above, in the discussion of the Merger Agreement.

15

§ 78m(a). Section 12, in turn, requires registration of securities transacted on a "national securities exchange." *Id.* § 12, 15 U.S.C. § 78*l*.[8] The securities at issue in this case were not offered on an exchange—that is the whole point of a Regulation D offering—and at least according to representations in the Merger Agreement (D.I. 28 Ex. C at 25-26), Sakhr has no other class of equity securities outstanding. So Sakhr is apparently not subject to the reporting requirements of § 13(a).

Section 15(d) imposes reporting requirements on issuers who have "file[d] a registration statement which has become effective pursuant to the Securities Act of 1933," and then only with respect to securities registered under § 12. Securities Exchange Act of 1934, § 15(d), 15 U.S.C. § 78o(d). To the best of the Shareholders' knowledge, Sakhr has not registered any securities under the 1933 Act. In short, the defendants have not shown that they are entitled to the benefit of the PSLRA's safe harbor. In any case, the safe harbor only applies where the plaintiff cannot prove "actual knowledge" that the statement or omission in question was false or misleading. The April 2010 Skancke e-mail, discussed below, contains direct evidence of actual knowledge "from the beginning."

        iii.    The Omission Is Not Protected By The "Bespeaks Caution" Doctrine.

Defendants argue that the inclusion of sufficient cautionary language in a document can render an omission immaterial and therefore non-actionable. But the cautionary language must be "extensive, specific, and directly related to the alleged misrepresentation." *In re Aetna, Inc. Sec. Litig.,* 617 F.3d 272, 282 (3d Cir. 2010). Here, the defendants point to only two statements in

---

[8] Section 12(g) also requires registration of securities held by more than 500 people, but it does not appear that Sakhr comes within this category. (D.I. 28 Ex. F at 5 (showing only five shareholders at the time of the merger).

16

the Information Statement that, according to them, bring the "bespeaks caution" doctrine into play.

The first is a statement that "forward-looking statements are not historical facts, but rather are based on current expectations ... Words such as 'anticipates,' 'expects,' 'intends,' 'plans,' 'believes' ... are intended to identify forward-looking statements." The second is a general statement to the effect that the transaction involved a "high degree of risk" and might present additional, unknown risks. (D.I. 27 at 17). Neither statement is enough to engage the doctrine. In the Third Circuit cases that have applied the doctrine, the cautionary statements have been much more closely linked with the fraudulent statements. *See, e.g., In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 279 (3d Cir. 2004) ("cautionary statements relate directly to the claim on which plaintiffs allegedly relied; the general representations of better business ahead were mitigated by the discussion of the several factors that could have caused poor financial results."); *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 320-21 (3d Cir. 1997) (officer stated company was "confident" of achieving 7% growth; annual report cautioned that the company would achieve that rate of growth "over time"). In the cases where the doctrine has not applied, the cautionary statements, like the statements in this case, were not closely related to the alleged frauds. *See, e.g., Semerenko v. Cendant Corp.*, 223 F.3d 165, 182-83 (3d Cir. 2000) (fraudulent statement predicted the amount of a restatement of past results; cautionary statement noted the risk that results of operations could vary in future fiscal years); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 709 (3d Cir. 1996) (misstatement concerned loan loss reserves; cautionary statements concerned the potential future of the market).

      c.    The May 7 Letter

In his May 7, 2009 email, Al-Yaqout explained that if the merger was to be accomplished by issuing *new* Sakhr shares for the Shareholders, "an independent valuer appointed by the

{00631210;v1 }

[Kuwaiti] Court of First Instance at the request of the company" would be required. (D.I. 1 ¶ 20). The reference, as the defendants suggest in their brief, is to a valuation of EMS, presumably because the Kuwaiti authorities charged with protecting investors in Kuwaiti firms would want to satisfy themselves that by issuing new stock in return for shares of EMS, Sakhr would not be harming its shareholders.

In response to the question: "If we decide to go a different route, and redistribute *existing* Sakhr shares instead of issuing new ones, will this remove the need for the lengthy process?" (emphasis added), Al-Yaqout responded: "Yes. There would be no lengthy process involved in such a scenario." (D.I. 1 ¶ 20).[9] This statement was false because, as alleged in the complaint (D.I. 1 ¶ 38), the defendants knew "*from the beginning*" that Kuwaiti governmental approval *was* required.

The defendants try to take advantage of the well-established rule, in securities fraud cases, that "vague and general statements of optimism," "subjective analysis or extrapolation," or similar fuzzy statements are not actionable because they are immaterial. The cases they cite are entirely dissimilar from the case at hand. In *In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357, 368 (3d Cir. 1993), for example, the representation was that issuer "believe[d] that funds generated from the operation of the Taj Mahal [Casino] will be sufficient to cover all of its debt service (interest and principal)." This is, of course, a classic non-actionable statement, because it is a prediction about something inherently uncertain—the issuer's future business prospects.

---

[9] The defendants say (D.I. 27 at 14-15) that Al-Yaqout's e-mail "specifically noted that the transfer 'would require an independent valuer appointed by the Court." That is a plain misreading of the email. The e-mail actually notes the necessity for an independent valuer, but *only if new shares were issued.*

18

Similarly, in *Advanta,* 180 F.3d at 538-39, the alleged misstatements were "merely report[s of] previous successes and express[ions of] confidence in Advanta's prospects for future growth."[10]

The misrepresentations here were, in contrast, highly specific and on a question of precise and accurate answer. The defendants represented that no Kuwaiti governmental approval of the merger was required. There is nothing vague about this. It is not an expression of mere optimism. It is a specific statement that led the Shareholders to believe that Kuwaiti governmental approval of the merger was not a condition precedent to delivery of the Sakhr shares to them. The fraudulent statement here is much more specific than, for instance, a statement expressing optimism that the government would approve a merger over antitrust concerns, *see In re Sprint Corp. Sec. Litig.,* 232 F. Supp. 2d 1193, 1219 (D. Kan. 2002) (denying motion to dismiss), and *a fortiori* it is material.

    2.    The Defendants Acted With Scienter

        a.    The April 2010 Skancke Email Shows That Sakhr Always Knew That Kuwaiti Government Approval Was Required

The defendants' brief follows the now-classic playbook for motions to dismiss in PSLRA cases, arguing that the inferences of scienter the Shareholders wish to draw are not more compelling as the inferences of innocence that the defendants assert, without coming to grips with the smoking gun admission in this case—an e-mail from a senior Sakhr officer that the defendants knew "*from the beginning*" that Kuwaiti governmental approval would be required.

_____

[10] The defendants miscite *In re NAHC, Inc. Sec. Litig.,* 306 F.3d 1314, 1330 (3d Cir. 2002) for this proposition (D.I. 27 at 14). There however, the supposed misstatement was a misstatement of an issuer's goodwill on a Form 10-K. The court held that the statement was immaterial in light of the company's concurrent specific disclosure of the impact of a proposed liquidation of the company, which rendered the supposed misstatement of the goodwill immaterial. This case has no concurrent specific disclosures that mediated the express representations set forth in, among others, the Information Statement and Sections 4.3 and 4.4 of the Merger Agreement.

The email, dated April 8, 2010, written in response to complaints by the Shareholders about Sakhr's failure to deliver the promised shares, is as clear as can be:

> Its [sic] a process and we waited to have all the docs from all the shareholders before we went to the kuwaiti [sic] government for validation of docs.
>
> **We knew this from the beginning** and aren't seeing it as delayed. For those who responded right away to the document request, it will seem like a long time though.

(D.I. 1 ¶ 48) (emphasis supplied).

> ###### b.   Skancke's Knowledge Is Attributable To Sakhr Stock, EXMS, And Sakhr.

The defendants accuse the Shareholders of impermissible "group pleading" in their assertions about the defendants' scienter. The rule against group pleading, as the defendants say, is the rule prohibiting plaintiffs "to plead that defendants made a misstatement or omission of a material fact without pleading particular facts associating the defendants to the alleged fraud." *Winer Family Trust v. Queen,* 503 F.3d 319, 335 (3d Cir. 2007).

The defendants' group pleading argument fails because the group pleading rule has to do with attributing the false statements of one defendant to a group of defendants, not with scienter. In other words, the doctrine prohibits a plaintiff from pleading, say, that a false statement in a press release or SEC filing is attributable to all of the company's officers and directors. *See Winer,* 503 F.3d at 335 ("The group pleading doctrine is a judicial presumption that statements in group-published documents … are attributable to officers and directors who have day-to-day control or involvement in regular company operations").

In the case at hand, there is no question about who *made* the false statements (or who is responsible for the material omissions). The Merger Agreement expressly states that the representations at issue were made by Sakhr, Sakhr Stock, and EXMS. (D.I. 28 Ex. C at 24). The Information Statement expressly states that the information concerning Sakhr it contains comes from Sakhr. (D.I. 28 Ex. A at 4). The Al-Yaqout email was forwarded to the EMS Shareholders

20

by Sakhr (D.I. 1 ¶ 21) and is therefore Sakhr's representation. Skancke was a senior Sakhr representative charged with actively participating in the Merger negotiation, and one of the signatories to the Merger Agreement.

But even if the notion of group pleading applied to the defendants' arguments about scienter, the facts of this case are precisely the *opposite* of the facts relevant to a group pleading analysis. In a group pleading case, one begins with a document issued in the name of a corporation or a document authored by a group of people—an SEC disclosure statement, for example—and then asks which people associated with the corporation or the group are sufficiently tied to the statements. Here, the document most clearly relevant to scienter, Skancke's April 2010 e-mail, is the work of a known corporate representative, and the question is to whom his knowledge is fairly attributable.

The Third Circuit has not decided among the various approaches to attribution of scienter to a corporation. Some courts hold that the person who makes the fraudulent statement on behalf of a corporation need not be the person whose knowledge is to be attributed to the corporation for purposes of the scienter analysis. *See, e.g., Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 513 F.3d 702, 709-10 (7th Cir. 2008) (test is whether *any* member of senior management had the requisite knowledge). Other courts hold that the person who makes the fraudulent statement must be the person with the culpable knowledge. *See Southland Secs. Corp. v. INSpire Ins. Solutions Inc.,* 365 F.3d 353, 366 (5th Cir. 2004). The Third Circuit, while affirming a decision adopting the approach in *Southland,* has expressly left the question open. *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.,* 442 Fed. Appx. 672, 676-77 (3d Cir. 2011).

Under either standard, Skancke's knowledge is attributable to Sakhr Stock and EXMS (and its successor, EMS) because he was the officer of the two non-operating entities (D.I. 1 ¶¶

21

49-50), whose only purpose was to help effect the merger (D.I. 1 ¶ 28, 34). In other words, Sakhr Stock and EXMS were mere vehicles for the merger. In neither case were there true employees or agents of the corporations such that it makes sense to even consider whether the makers of the false statements were different from the person with knowledge of the statements' falsity.

Skancke's knowledge is also attributable to Sakhr itself, though Sakhr, a true operating company, is a different case. Skancke was acting as Sakhr's agent in its dealings with the Shareholders (D.I. 1 ¶ 51). Indeed, Skancke's admission of knowledge was the last in a series of messages that began with a request by Skancke for documents from some of the Shareholders to be submitted to the Kuwaiti authorities (D.I. 28 Ex. E at 3). Skancke himself, of course, had no *personal* stake in the matter, as he was not a party to the Merger Agreement. Skancke plainly was writing on behalf of Sakhr, not himself, when he wrote that "So far we have not been able to hear back from" the Shareholders.[11] In other words, it is plain from Skancke's e-mail itself that Skancke was referring to what everyone on Sakhr's side of the deal knew.

    c.    <u>The Defendants' Use Of Lawyers Cannot Shield Them From Liability At The Pleading Stage.</u>

The defendants argue that the May 7 email from Al-Yaqout shows that Sakhr was relying on its lawyers and other advisors, and that its reliance on them negates any possibility of scienter. Of course, this argument cannot be correct on its face, because all or nearly all companies that make securities offers are represented by lawyers, accountants, and other advisors. Moreover, the complaint does not allege that the defendants relied on their lawyers' advice, nor can the defendants offer to prove that they did, given the procedural posture of the case.

---

[11] The "we" is necessarily a reference to Sakhr rather than to, say, Sakhr Stock or EXMS, since the documents necessary for submission to the Kuwaiti authorities had nothing to do with either of the two Delaware entities; the Kuwaiti government's interest extended only to Sakhr itself.

{00631210;v1 }

In a typical advice of counsel case, a company makes a representation to investors and then, when it is sued, points to an opinion letter or some other advice received from its lawyers to negate the inference of scienter. Here, to the contrary, Sakhr took information it had received from its lawyer and passed it to the Shareholders as fact with the intention of inducing them to purchase shares of Sakhr stock.

To be sure, "advice of counsel may bear upon scienter in some cases." *Pittsburgh Terminal Corp. v. Balt. & Ohio R. R. Co.*, 680 F.2d 933, 942-43 (3d Cir. 1982). Here, though, the defendants, through Skancke's email, have admitted that they knew all along that government approval was required. Where defendants "know the materiality of the concealed information and intend the consequences of concealment, advice of counsel … cannot be recognized as a defense." *Id.* at 943.

    d.    <u>The Competing Inferences Favor The Shareholders</u>

Under the PSLRA, the Shareholder's burden is to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Securities Exchange Act of 1934, § 21D(b)(2), 15 U.S.C. § 78u-4(b)(2). An inference is "strong" if it is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 314 (2007). The Shareholders can satisfy this burden by pleading "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Key Equity Investors, Inc. v. Sel-Leb Mktg., Inc.,* 246 Fed. Appx. 780, 784-85 (3d Cir. 2007).

The inference that the Shareholders ask the Court to draw is simple. When Skancke admitted that "we [Sakhr] knew … from the beginning" that Kuwaiti governmental "validation" would be required, he meant that Sakhr had known during all times material to the merger agreement, including during the negotiation of the merger agreement, that Kuwaiti governmental

approval would be required. This is hardly an inference at all—it is simply what Skancke wrote. Since, as we argue above, the multiple merger representations that no Kuwaiti governmental approval was required were false, the strongest inference is that Skancke admitted that the defendants knowingly made false statements, which is sufficient to show scienter.

The inference the defendants press on the Court is that "the formal process of receiving documentation from shareholders and then registering the transfer to those shareholders in Kuwait simply turned out to be more burdensome and time consuming than originally expected." (D.I. 27 at 21). This phrasing wrongly suggests a mere delay, nothing more than an inconvenience. In fact, the merger closed *two and a half years ago* (D.I. 1 ¶ 54) and the Shareholders still have not received any consideration for their stock (D.I. 1 ¶ 57), and there is no apparent prospect that they will. This is not a case of delayed performance; the defendants simply walked away from the deal after taking the plaintiffs' stock, company and corporate assets.

C.   The Shareholders Have Stated Claims For Common Law Fraud And Securities Fraud Under Delaware Law.

1.   Fraud

The pleading burden in a fraud case is significantly lower under Delaware law than is the burden of pleading a securities fraud claim under the PSLRA. The complaint must satisfy Rule 9(b) and the ordinary plausibility rules of *Ashcroft v. Iqbal.* But there is no requirement that the Court weigh the inference of scienter against competing non-fraudulent inferences, and there is no special burden of pleading materiality. The only requirement is that the complaint "allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico,* 507 F.3d at 200. As shown above, the complaint easily meets this standard.

24

2.     Delaware Securities Act

The elements of the Delaware securities fraud claim are essentially the same as the

elements of the federal claim. For present purposes, they are identical, as both claims require a

false statement or omission of material fact and scienter. *See Hubbard v. Hibbard Brown & Co.,*

633 A.2d 345, 349 (Del. 1993). For pleading purposes, though, the claims differ, because as the

defendants recognize, the PSLRA does not apply to the Delaware claim. Thus the two main

changes the PSLRA worked in federal practice do not apply.

First, there is no requirement that the Shareholders plead "with particularity facts giving

rise to a strong inference that the defendant acted with" scienter. Securities Exchange Act §

21D(b)(2), 15 U.S.C. § 78u-4(b)(2). Instead, the question is simply whether the Shareholders

have pleaded "factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. Even if the Shareholders

had not shown that the inference of scienter is the strongest inference, it is at least a *reasonable*

inference given the April 2010 Skancke email in particular.

Second, there is no requirement, above and beyond the requirement of Rule 9(b), that the

Shareholders plead the fraudulent statements with heightened particularity. Here, the

Shareholders have plainly pleaded the statements and omissions at issue and the reasons why

they are false in sufficient detail to defeat the motion to dismiss.

D.     The Shareholders Have Stated Claims For Control Person Liability

The Shareholders have alleged that Skancke is a control person of Sakhr Stock and

EXMS, and that Al Sharekh is a control person of Sakhr. The defendants argue that there is no

control person liability because there is no liability for securities fraud. (D.I. 27 at 24). The

Shareholders agree that *if* there is no claim for securities fraud then there can be no claim for

25

control person liability. But the premise of the defendants' argument is wrong: as set forth above, the Shareholders have stated a claim for securities fraud under both federal and Delaware law.

1.   Culpable Participation and the Federal Claim

The defendants also argue that the Shareholders have not adequately alleged that Al Sharekh and Skancke were culpable participants in the fraud. It is true that ultimately the Shareholders will have to prove that Skancke and Al Sharekh were culpable participants to prevail on the *federal* control person claim. *See In re Suprema Specialties, Inc. Sec. Litig.,* 438 F.3d 256, 284 n.16 (3d Cir. 2006). But there is a split among the district courts in the Third Circuit about whether culpable participation must be pleaded as an element of the prima facie case. *See In re Washington Mut., Inc.,* 462 B.R. 137, 143 (Bankr. D. Del. 2011) (noting split among the district courts). On the one hand, *In re Digital Island Sec. Litig.,* 223 F. Supp. 2d 546, 561-62 (D. Del. 2002), *aff'd on other grounds,* 357 F.3d 322 (3d Cir. 2004), holds that allegations of culpable participation must "meet the PSLRA's standard for particularity," citing—with no real discussion—*In re Splash Tech. Holdings, Inc. Sec. Litig.,* 2000 WL 1727377 (N.D. Cal. Sept. 29, 2000). On the other hand, in *Jones v. Intelli-Check, Inc.,* 274 F. Supp. 2d 615, 645 (D.N.J. 2003) (citation and internal quotation marks omitted), the court rejected a requirement that the plaintiff plead culpable participation, noting that the "overwhelming trend in this circuit is that culpable participation does not have to be pled in order to survive a motion to dismiss."

*Jones* was correctly decided. In light of the pre-PSLRA precedent in the Third Circuit, which *Jones* referenced, the question is whether enactment of the PSLRA did anything to change the law with regard to *pleading* a claim for control person liability. As the court noted in *In re Washington Mutual,* 462 B.R. at 143 (citation and internal quotation marks omitted), "It would place an unreasonable burden on the claimant to require a pleading of culpable participation

26

because the facts establishing culpable participation can only be expected to emerge after discovery and virtually all of the remaining evidence, should it exist, is usually within the defendant's control."

But even if the Shareholders are required to plead culpable participation, they have alleged more than enough to overcome a motion to dismiss. Skancke signed the Merger Agreement containing the fraudulent misstatements on behalf of Sakhr Stock and EXMS, *and,* as shown by his April 2010 e-mail, he had knowledge that the representations about the lack of a need for Kuwaiti government approval were false. While signing the document containing the misrepresentations, without more, may be insufficient to show culpable participation, signing or approving the document, together with knowledge of the misrepresentation, *is* plainly sufficient to show culpable participation. *See In re Reliance Sec. Litig.,* 135 F. Supp. 2d 480, 512 (D. Del. 2001).

Moreover, while dicta in the case the defendants cite, *Digital Island,* 223 F. Supp. at 561, make the point that a defendant's status as an officer or director is not enough, by itself, to show culpable participation, here, it appears that Skancke was the *only* officer of the two non-operating entities. There is no other person who could be responsible for their representations.

    2.    <u>The Delaware Claim</u>

The defendants make no argument for the dismissal of the Delaware control person claim, other than to assert, correctly, that the claim stands or falls with the Delaware securities fraud claim. Because the defendants have offered no other reasons why the claim should be dismissed—because in particular they have not asserted much less shown that culpable participation is an element of the claim, let alone an element that must be pleaded—the Court should deny their motion to dismiss the claim. The burden is on the defendants to show that the

27

complaint fails to state a claim for relief, not on the Shareholders to box with shadows. *See*

*Gould Elecs., Inc. v. United States,* 220 F.3d 169, 178 (3d Cir. 2000).

E.    The Court Should Exercise Subject-Matter Jurisdiction

    1.    The Court Should Exercise Supplemental Jurisdiction

The Shareholders have stated a claim for securities fraud under federal law, but even if

that claim should fail, the Court should continue to exercise supplemental jurisdiction over the

state law claims. *See* 28 U.S.C. § 1367(c)(3) (court has discretion to exercise supplemental

jurisdiction if all claims within its original jurisdiction have been dismissed).

In making this discretionary decision, courts consider factors such as judicial economy,

convenience and fairness to litigants, and comity. *See United Mine Workers of Am. v. Gibbs,* 383

U.S. 715, 726 (1966). In the usual case, these factors can point towards dismissal of state-law

claims. *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988). But it is well-settled that

dismissal is not mandatory, but is within the discretion of the judge. *See Henglein v. Informal*

*Plan for Plant Shutdown Benefits for Salaried Employees,* 974 F.2d 391, 398 (3d Cir. 1992).

Here, factors of economy weigh strongly in favor of retaining jurisdiction. Despite the

Shareholders' promptness and diligence in effecting service of process on the Kuwaiti

defendants, it took nearly four months to effect service of process on them via the Hague Service

Convention, and it took an additional two months to receive proof of service from the Kuwaiti

Ministry of Justice. The Shareholders expect that if they have to re-file their action in the

Delaware courts, it would be another six months before the Kuwaiti defendants were fully

engaged in the litigation.

2.      In The Alternative, The Court Should Grant Leave To Amend The Complaint To Assert Diversity Jurisdiction

If the Court is unwilling to retain jurisdiction on a discretionary basis, it should grant leave to amend the Complaint. The only reason the Shareholders were unable to plead diversity jurisdiction in the complaint is the presence in the case of one US citizen, Edward Van Roy, who happens to live abroad. As a US citizen domiciled abroad, Mr. Van Roy is neither a citizen of a state of the United States, for jurisdictional purposes, nor an alien. *See Pemberton v. Colonna,* 290 F.2d 220, 221 (3d Cir. 1961). His presence in the case therefore likely destroys complete diversity. *See, e.g., Rick v. Women's & Children's Hosp.,* 2010 WL 2360703 (W.D. La. May 10, 2010) (citing *Newman-Green, Inc. v. Alfonzo-Larrain,* 490 U.S. 826, 828 (1989)).

Mr. Van Roy owns less than 1% of the total shares owned by the Shareholders, and if required, he is willing to be dropped from the case to avoid dismissal. "On motion or on its own, the court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21. One of the classically approved uses of Rule 21 is to drop "dispensable non-diverse" parties for the purpose of preserving diversity jurisdiction. *See Newman-Green,* 490 U.S. at 832. If the Court is unwilling to entertain the case under its supplemental jurisdiction, it should permit the Shareholders to move to drop Edward Van Roy from the case and to amend their complaint to assert diversity jurisdiction.

F.      The Court Has Personal Jurisdiction Over Al Sharekh.

Fahad Al Sharekh claims that the Court lacks personal jurisdiction over him. To the contrary, this Court's exercise of jurisdiction over Al Sharekh is both authorized by Rule 4 and permissible under the Due Process Clause. Service of this Court's summons establishes personal jurisdiction over Al Sharekh if he "is subject to the jurisdiction of a court of general jurisdiction" in Delaware, Fed. R. Civ. P. 4(k)(1)(A), *or* "when authorized by a federal statute," Fed. R. Civ.

29

P. 4(k)(1)(C). Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, which provides for

nationwide service of process in securities fraud cases, reaches to the limits of the Due Process

Clause of the Fifth Amendment regardless of the reach of the relevant long-arm statute. *See*

*Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 369 (3d Cir. 2002) ("Where Congress has spoken

by authorizing nationwide service of process, therefore, as it has in the Securities Act, the

jurisdiction of a federal court need not be confined by the defendant's contacts with the state in

which the federal court sits"). Therefore, the relevant question is not whether Al Sharekh had the

requisite minimum contacts with Delaware, but rather whether he had the requisite minimum

contacts with the United States.[12] He did.

    1.    Al Sharekh's Contacts With The United States

Al Sharekh traveled to the United States in connection with the negotiation of the merger.

He and his brother, Abdullah Al Sharekh (also a director of Sakhr) traveled to Miami in March

2009 to meet with Adeeb Shana'a, the CEO of EMS. (Shana'a Decl. ¶ 3). The meeting, which

took place at Fahad's suggestion and which lasted most of the day, included a discussion of the

financial conditions of the two companies and of the technologies each brought to the table. (Id.).

Importantly, they also discussed the financial terms of the proposed merger and reviewed a draft

letter of intent. (Id.). Prior to the Miami meeting, Al Sharekh spoke with Shana'a at least twice

by phone for the purpose of discussing the terms of the potential merger, including its financial

and operational aspects and the terms of the letter of intent. (Shana'a Decl. ¶ 7).

In July 2009, Al Sharekh came to Washington to meet with Skancke and Ambassador

Marcelle Wahba, a former US diplomat with wide experience in the Middle East. The purpose of

---

[12] Note that while some cases speak of "nationwide service," § 27 actually permits service "wherever the defendant may be found." Thus the fact that Al Sharekh was served in Kuwait rather than in the United States does not change the analysis.

the meeting was to seek Ambassador Wahba's help in introducing the post-merger company's products to potential customers. (Shana'a Decl. ¶ 8).

In September 2009, after the letter of intent and the definitive agreement but before the closing, Al Sharekh again came to Washington to meet with Shana'a and others. At this meeting, Al Sharekh and the other meeting participants went on joint sales calls and had meetings aimed at the customers who, they hoped, would be interested in doing business with the post-merger company. (Shana'a Decl. ¶ 5). On September 28, Al Sharekh met with Skancke and Shana'a in New York City for meetings with a potential investor in the post-merger company. (Shana'a Decl. ¶ 6).

Al Sharekh also attended, by videoconference, another meeting leading up to the merger, at which the other participants—teams from EMS and from Sakhr USA—gathered in Sakhr USA's Washington offices.[13] (Shana'a Decl. ¶ 4). The meeting, held after the letter of intent had been signed, was for the purpose of discussing the products and technologies that the companies would develop and market after the merger.

Al Sharekh also expressly authorized the transmission into the United States of the May 7, 2009 email, which contains one of the misrepresentations on which the fraud claim rests. In particular, Hassan Hanano, a consultant working for Sakhr on the merger, asked Al Sharekh's permission to forward to Shana'a the Al-Yaqout email stating that if Sakhr transferred existing shares instead of issuing new shares, no process of Kuwaiti government approval would be

---

[13] Telephonic communications, and *a fortiori* videoconferencing communications, "may count towards minimum contacts." *See Colvin v. Van Wormer Resorts, Inc.,* 417 Fed. Appx. 183, 187 (3d Cir. 2011) (citing *Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.,* 988 F.2d 476, 482 (3d Cir. 1993)).

31

required. (Shana'a Decl. ¶ 9 & Ex. 1). Thus he actually authorized the commission of one of the

acts of fraud alleged.

Last, Al Sharekh was a party to many communications to or from the United States

concerning the merger negotiations. For example, he was a recipient of an email from Skancke to

Shana'a on February 6, 2009 discussing the draft letter of intent. (Shana'a Decl. Ex. 2). He was a

recipient of an email on February 28 from Shana'a concerning the prospects for a merger.

(Shana'a Decl. Ex. 3). He was a recipient of an email from Skancke on March 2, 2009

summarizing the status of the merger discussions. (Shana'a Decl. Ex. 4). He was the recipient of

an email from Shana'a on March 5 regarding the upcoming meeting in Miami (which, according

to the email and Shana'a's declaration, was Al Sharekh's idea). (Shana'a Decl. ¶ 3 & Ex. 5). He

was a recipient, with Shana'a, of an email from Skancke on March 12 outlining proposed

changes to the merger terms. (Shana'a Decl. Ex. 6). He was a recipient, later that day, of another

email from Shana'a summarizing points from the Miami discussion, and a follow-up email from

Skancke on March 13. (Shana'a Decl. Ex. 7). He was the author of an email to Skancke, which

Skancke forwarded to Shana'a, on May 27, 2009, in which he proposed potential merger

structures. (Shana'a Decl. Ex. 8). In short, he was in the thick of things.

    2.    <u>Al Sharekh's Argument Fails.</u>

Al Sharekh's argument flies in the face of a very recent decision of this Court in which

the relevant facts were highly similar. In *Snowstorm Acquisition Corp. v. Tecumseh Prods. Co.,*

739 F. Supp. 2d 686 (D. Del. 2010), the defendants were Tecumseh, which sold a division to the

plaintiff, and Bonsall, an officer of Tecumseh and of the division for sale. When Tecumseh lost

one of its major customers due to the customer's dissatisfaction with the quality of its products, it

decided to sell its division. It prepared an offering memorandum which made representations

about the strength of its business without referencing the loss of the customer relationship or the

reason for the loss. In connection with the negotiation of a sale to the plaintiff, it made additional representations in a stock purchase agreement about the customer relationship that were allegedly fraudulent. When the buyer learned after the closing of customer troubles, it sued for securities fraud.

Bonsall moved to dismiss for lack of personal jurisdiction. He claimed to be living and working abroad; the plaintiff claimed he was living in Michigan. In any case, he had no contact with Delaware. His only contacts with the buyer were in Wisconsin, where the sale took place, and in Tennessee, and New York, and Indiana, where he visited in the course of the negotiations to make presentations or visit plant locations. *Id.* at 700.

Judge Robinson rejected Bonsall's jurisdictional defense, noting that § 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, provides for nationwide service of process, and that therefore the Due Process question was whether Bonsall had sufficient minimum contacts with the United States, not with Delaware. In other words, the Fifth Amendment, not the Fourteenth Amendment, governed. *Id.*

> As Bonsall has undisputed minimum contacts with the United States, he is amenable to personal jurisdiction in Delaware with respect to the 10b-5 claim. Neither the Delaware long-arm statute ... nor Fourteenth Amendment Due Process concerns are invoked in this federal question action.

*Id.*

As in *Snowstorm,* Al Sharekh has relevant contacts with the United States. In particular, he visited the United States, in person and by videoconference, to speak with EMS shareholders about the merger during the negotiations. (Shana'a Decl. ¶¶ 3-4). He also directed the Al-Yaqout email to be sent to United States recipients. (D.I. 1 ¶¶ 20-21). Thus Al Sharekh's extended discussion of the minimum contacts analysis with regard to Delaware (D.I. 27 at 29-30) simply misses the mark.

33

Although Al Sharekh has not pressed the point in his briefs, an issue can arise when a plaintiff asserts jurisdiction under a statute authorizing nationwide service of process and the plaintiff also asserts claim under state law. Because the state law claims in this case arise out of the same nucleus of operative facts as the federal securities law claim (a point Al Sharekh does not challenge), the Court has pendent personal jurisdiction of those claims. *See FS Photo, Inc. v. PictureVision, Inc.,* 48 F. Supp. 2d 442, 445 (D. Del. 1999) (pendent personal jurisdiction exists in federal securities law cases); *accord Snowstorm,* 739 F. Supp. 2d at 701.

Snowstorm does differ from Al Sharekh's case in one respect: in *Snowstorm* the plaintiff was suing Bonsall directly under § 10(b) rather than simply as a control person under § 20. But that distinction has no effect on the analysis. Where, as in this case, the control person actually authorizes the making of the false statement, his acts—not his mere status as a control person— are enough to bring him within the Court's personal jurisdiction. *See, e.g., In re Baan Co. Sec. Litig.,* 245 F. Supp. 2d 117, 132 (D.D.C. 2003) (personal jurisdiction over control person where the plaintiff could credibly allege culpable participation); *In re Royal Ahold N.V. Sec. & ERISA Litig.,* 351 F. Supp. 2d 334, 351-52 (D. Md. 2004) (approving exercise of jurisdiction over control person who approves the filing and dissemination of the document containing the misrepresentation); *Derensis v. Coopers & Lybrand Chartered Accountants,* 930 F. Supp. 1003, 1014 (D.N.J. 1996) (approving exercise of jurisdiction over control person involved in disseminating the document containing the misrepresentation). Moreover, Al Sharekh can hardly claim surprise that he has been haled into court in Delaware; the Merger Agreement had an exclusive Delaware choice of forum clause. (D.I. 28 Ex. C at 56). *See, e.g., Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC,* 650 F. Supp. 2d 1213, 1225 n.5 (S.D. Fla. 2009) (controlling shareholder of a party bound by forum selection clause for personal jurisdiction

{00631210;v1 }

purposes); *Pet Quarters, Inc. v. Badian,* 2006 WL 2265253, at *5 n.7 (E.D. Ark. Aug. 7, 2006) (control person could be haled into court where the document key to the case contained a New York forum selection clause); *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC,* 2003 WL 22882137, at *5-6 (S.D.N.Y. Dec. 4, 2003) (non-signatory CFO was bound by forum selection clause where she was closely related to the transaction, such that it was foreseeable that she would be bound by the clause).

Even if the Shareholders had failed to date to show that Al Sharekh is subject to specific personal jurisdiction, they should be permitted to take jurisdictional discovery to determine whether Al Sharekh is subject to general personal jurisdiction on account of his contacts with Sakhr USA, Sakhr's United States affiliate, or whether additional facts support the exercise of specific personal jurisdiction. In particular, the Shareholders believe that discovery would likely disclose regular ties between Sakhr USA, Sakhr's United States affiliate, and Al Sharekh that would be sufficient to subject Al Sharekh to this Court's general jurisdiction, and that discovery would likely also disclose that Al Sharekh was involved in the approval of the Merger Agreement and the Information Statement, the two other documents that contain the relevant misstatements and omissions. The evidence of Al Sharekh's relevant contacts with the United States meets the necessary "threshold showing" of "factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts between [Al Sharekh and the United States]." *Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 456 (3d Cir. 2003) (citations and internal quotation marks omitted).

<u>CONCLUSION</u>

For the foregoing reasons, the defendants' motion must be denied, or the plaintiffs granted leave to amend their complaint or take jurisdictional discovery as set out in the body of this memorandum.

35

{00631210;v1 }

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
jday@ashby-geddes.com
tlydon@ashby-geddes.com
lmaguire@ashby-geddes.com

*Attorneys for Plaintiffs*

*Of Counsel:*

Daniel J. Lyne, pro hac vice
Theodore J. Folkman, pro hac vice
Ryan E. Ferch, pro hac vice
MURPHY & KING, P.C.
One Beacon St.
Boston, MA 02108
(617) 423-0400
djl@murphyking.com
tjf@murphyking.com
ref@murphyking.com

Dated: May 14, 2012

36